2004-NMCA-116

99 P.3d 1166

**Charles BERRY, for himself and all others similarly situated, Plaintiff–Appellee,**

v.

**FEDERAL KEMPER LIFE ASSURANCE COMPANY, Defendant–Appellant.**

No. 23,186.

Court of Appeals of New Mexico.

July 23, 2004.

Certiorari Denied, No. 28,850, Sept. 17, 2004.

Paul G. Bardacke, John M. Eaves, Peter S. Kierst, Kerry C. Kiernan, Karen S. Mendenhall Eaves, Bardacke, Baugh, Kierst & Larson P.A., Dennis M. McCary, Floyd D. Wilson, Alan R. Wilson, McCary, Wilson & Pryor, Alan Konrad, Albuquerque, NM, for Appellee.

David F. Cunningham, Rubin Katz Law Firm, P.C., Santa Fe, NM, J. Kevin McCall,

Clark C. Johnson, Suzanne J. Prysak, Jenner & Block, LLP, Chicago, IL, for Appellant.

Victoria E. Fimea, American Council of Life Insurers, Washington, D.C., George Ruhlen, Mayer, Brown, Rowe & Maw, Santa Fe, NM, Evan M. Tager, Craig W. Canetti, Mayer, Brown, Rowe & Maw, Washington, D.C., for Amicus Curiae American Council of Life Insurers.

Betty D. Montgomery, Attorney General, Scott Myers, Lawrence D. Pratt, Assistant Attorney Generals, Columbus, OH, Ann Maloney Conway, Cynthia A. Braun, Huffaker & Conway, P.C., Albuquerque, NM, for Amicus Curiae Lee Covington, II, Superintendent, Ohio Dep't of Insurance.

Randal W. Roberts, Simone, Roberts & Weiss, P.A., Albuquerque, NM, for Amicus Curiae National Association of Insurance Commissioners.

## OPINION

BUSTAMANTE, Judge.

{1} The district court certified a nationwide class action against Federal Kemper Life Assurance Company (Kemper) seeking damages assertedly caused by Kemper's modal premium program for life insurance policies. Kemper appealed from the certification order pursuant to Rule 1–023(F) NMRA 2004. Affirming in part and reversing in part, we address a number of issues of first impression under New Mexico's class action rule, including: (1) standards for consideration of Rule 1–023(A) requirements of numerosity, commonality, typicality, and adequate representation; (2) the difficulties posed by multistate class actions; and (3) appropriate methods for considering and resolving the questions of predominance and superiority under Rule 1–023(B)(3).

## FACTS AND PROCEDURES

{2} This is one of several class action cases pending in New Mexico asserting various claims by insureds against insurance companies based on their modal premium schemes. Reflecting variations in policy language and marketing approach, the suits are not identical but they generally assert that the defendant insurers have failed to properly inform

their policy holders of the different rates charged when premiums are paid more often than once a year.

{3} In this case, the First Amended Complaint alleges that because Plaintiff Charles Berry (Berry) chose to pay semi-annually, Kemper charged him $122 more per year than the "Guaranteed Maximum Premiums after the First Policy Year" stated in the policy. Coupling this basic factual assertion with allegations that Kemper intentionally or otherwise failed to disclose the dollar value of, or an equivalent interest rate for, the different premiums, Plaintiff pleaded a number of potential causes of action, including: Count 1, common law breach of contract; Count 2, common law breach of duty to disclose material facts; Count 3, common law breach of duty of good faith and fair dealing during contract performance; Count 4, unjust enrichment; and Count 5, violation of New Mexico's Unfair Practices Act. The district court limited its certification to the breach of contract and the good faith and fair dealing theories.

{4} The common law breach of contract claim relies on the language of the class representative's Kemper policy. Pertinent portions of the policy are attached to this opinion as Appendix 1. The class emphasizes the language on the "Policy Specifications" page specifying "Total Premiums" for the first year—broken down by payment made—and the language immediately following, which provides "Annual 'current premiums after the first policy year' are shown beginning on the next page. Annual 'guaranteed maximum premiums after the first policy year' are shown on the pages that follow 'current premiums after the first policy year.' " The following page of the policy is labeled "Current Premiums After First Policy Year" and, under the column headed "Total Annual Premiums," lists $3050 as the amount payable through year ten of the policy.

{5} The class also relies on a definitional provision that includes an integration clause and a list of the items that make up the contract between Kemper and its insured.

This policy, with any proper changes, is the entire contract between you and us.

Only our president, vice-president, secretary, or assistant secretary can change, modify, or waive any provisions of this policy.

This policy includes: 1. the Policy Specifications; 2. the attached application; and 3. any supplemental applications, riders, amendments or endorsements made a part of this policy.

{6} Kemper, of course, acknowledges these terms of its standard form policy. In response, Kemper points to Berry's application for coverage in which he agreed to make semi-annual payments in the amount of $1586, combined with a policy provision that incorporates the application and makes it "a part of this policy." Kemper argues these provisions prove Berry unqualifiedly agreed to the premium he has been paying since the policy went into force.

{7} Kemper also emphasizes the "Premium Payment Section" of the policy which includes this language: "After the first policy year, the semi-annual, quarterly, or preauthorized monthly payments for each policy year will be determined on the same basis as that used to determine the premium for the selected mode for the first policy." Kemper argues this provision makes it clear the premium amount set in the policy application will continue for the initial ten-year guaranteed rate term.

{8} The failure-to-disclose and breach of the duty of good faith counts are based on assertions that Kemper does not inform insureds they will pay more if they choose to pay their premiums on a schedule other than once a year. Kemper responds that the arithmetic difference between annual and other modes of payment is obvious on the face of its policies. Kemper also asserts that at least some selling agents explain the dollar difference in premium rates during the sale process. Kemper acknowledges that the dollar difference between premium modes is never expressed as an interest rate or APR.

{9} Apart from discovery wrangles, the procedural history of the case is relatively simple. Kemper filed a motion to stay or dismiss "based on the primary jurisdiction and filed rate doctrines," seeking to have the

entire matter referred to the New Mexico Superintendent of Insurance. The district court denied the motion and Kemper has not sought to appeal that denial. Some of Kemper's arguments in support of this motion do appear here in support of its position that federalism concerns and principles of state sovereignty prohibit recognition of a nationwide class.

{10} Kemper also filed a second motion to dismiss pursuant to Rule 1–012(B)(6) NMRA 2004, prior to filing an answer. Following briefing, the district court denied the motion in its entirety. The district court's rationale in denying the motion is not directly relevant to this appeal, except in one respect. One paragraph of the Order denying dismissal states: "As to Defendant's argument that the language of the insurance policy was clear such as to preclude breach of contract, common law disclosure or Unfair Practices Act claims, it appears there were omissions raising issues of ambiguity and materiality precluding dismissal under Rule 1–012(B)(6)." As will become clear, this language has become a bone of contention between the parties on appeal.

{11} Plaintiff filed his motion for class certification on the heels of the district court's oral denial of Kemper's motion to dismiss. The motion proposed certification of a class "composed of all persons who reside in the United States who, at any time between January 1, 1985, and the date of class certification, have made premium payments to [Kemper] with respect to an individual life insurance policy on a monthly, quarterly, or semi-annual basis." The motion also requested certification of a fifteen-state subclass—including New Mexico—for Plaintiff's Unfair Trade Practices claims asserting that the statutory provisions in these jurisdictions were "comparable to, and consistent with, New Mexico's."

{12} The motion to certify was litigated primarily on paper. The parties stipulated to the documentary evidence the district court should consider. The parties also designated portions of deposition testimony for the district court to review rather than present live testimony.

{13} The record thus compiled reveals that Kemper's term life insurance policy forms issued at least since 1994—including class representative Berry's—were identical in all aspects pertinent to this case. That is, with minor variations, all of the policy forms address the annual and modal premium structure as described above. Only the forms issued in Pennsylvania provide specific instructions in the policy about how an insured can calculate the modal premium amount. The district court excluded residents of Pennsylvania from the class.

{14} The record also reveals that the life insurance application forms Kemper used for the policies involved here were the same, with small variations. All of the application forms request the applicant to select a premium payment mode. While some forms did not disclose all of the premium payment modes available, most allowed a choice of monthly, quarterly, semi-annual, or annual to be selected. None of the application forms provided any information about the specific dollar amount of each payment made, or the dollar difference between modes, and none expressed the difference in cost as an annual interest or percentage rate. If premium illustrations were provided detailing all four payment modes, the dollar difference could be computed arithmetically.

{15} The record also contains representative copies of the General Agent's Agreements Kemper has used during the time frame covered by the certification order. Used because Kemper does not have an in-house sales force, the agreements are essentially identical, and all contain limitations on the agent's ability to (1) modify Kemper's policies, contracts, or other forms; (2) make any representations about Kemper's policies unless they are contained in materials furnished or previously approved in writing by Kemper; and (3) use any advertising or sales material unless it has previously been approved by Kemper. Kemper witnesses agreed these provisions were uniformly enforced by Kemper.

{16} The same witness testified he never saw any advertising material that disclosed the dollar difference between the annualized cost of the various premium modes. Kemper

neither required agents to disclose nor forbade agents from disclosing the comparative costs of the various modes of payment.

{17} The only direct evidence in the record of agent practices during sales is contained in four affidavits attached to Kemper's brief in response to the motion for class certification. The affidavits are by four individual selling agents—two from Illinois, and one each from Ohio and California. Each of the agents describes his individual approach to selling insurance, in particular with regard to explaining the different modes available for paying premiums. One of the agents typically provides premium illustrations for monthly, semi-annual, and annual payment schedules. The other three only provide the annual premium initially. All four of the agents aver that they explain (in varying degrees of detail) the dollar difference between the modes if payment obligations become an issue in the sales conversation. They also state that they explain that the client must pay the premium set for the mode chosen in order to keep the policy in force, subject to a client-driven change in mode. None of the affidavits address directly whether there is any explanation given as to how the "Guaranteed Maximum Premiums" and "Current Premiums After the First Policy Year" provisions of the policy relate to or affect the insured's modal premium choice.

{18} Plaintiff also provided the district court with statutory and case law surveys as part of its effort to demonstrate that the law concerning interpretation of contracts, breach of contracts, and the duty of good faith and fair dealing is sufficiently uniform across the country to allow efficient management of the litigation in New Mexico.

■ {19} The district court held a hearing on the motion, at which the named Plaintiff and proposed class representative, Berry, testified briefly. The majority of the certification hearing was devoted to argument by counsel and queries from the district court. The district court announced its ruling and explained its rationale at the conclusion of the hearing. The district court declined to enter formal findings of fact with the order certifying the class. However, because the district court explicitly stated that its oral explanation was the basis for its ruling, we will refer to its remarks as appropriate when addressing the parties' arguments. *Ledbetter v. Webb*, 103 N.M. 597, 603, 711 P.2d 874, 880 (1985) (reviewing court may look to remarks of district court to clarify basis for its orders); *Jeantete v. Jeantete*, 111 N.M. 417, 419, 806 P.2d 66, 68 (Ct.App.1990) (same).[1]

{20} In his oral remarks at the close of the certification hearing, the district court addressed each of the Rule 1–023(A) factors in turn and found each was met, along the way resolving certain factual disputes—in particular concerning the propriety of Berry continuing as the class representative. The district court also stated there was "no question" that substantially similar contract terms were involved, and it asserted its belief that there are "generally standardized procedures for the dealings between ... the members of the class and Federal Kemper." The district court observed that in its view, "there really are comparatively small damages involved on an individual basis."

{21} Turning to the Rule 1–023(B) requirements, the district court quickly decided that subsections (B)(1) and (B)(2) were not met. The class has not appealed this ruling. With regard to Rule 1–023(B)(3), the district court found that common issues of law and fact predominated with regard to the contract claim because of the similarity between policies and between applications. In the district court's view, these factual similarities raised common questions of law as to the terms of the contract, whether the language of the contracts is plain and unambiguous, and, ultimately whether there was a breach by Kemper. The district court decided there were common issues with regard to the duty of good faith claim; specifically whether "Kemper had a duty to disclose the dollar

---

1. We take this opportunity to state a strong preference for district courts entering formal findings of fact and conclusions of law in support of their ruling in Rule 1–023 proceedings. Findings will make review on appeal more informed and will force the parties to explicitly address the Rule's requirements. *See Salcido v. Farmers Ins. Exch.*, 2004–NMCA–006, ¶ 19, 134 N.M. 797, 82 P.3d 968.

difference or the APR related to the various payment plan choices," and whether a failure to disclose had a tendency to deceive the insureds.

{22} The district court recognized there was an issue whether an individualized inquiry would be necessary to determine each class member's understanding based on information they may have received outside the policy and application, primarily from their sales agents. The district court decided that most of the issues raised by Kemper defenses were common issues subject to common proof. The district court determined that while there may be some individual issues, they did not overwhelm the common issues.

{23} The district court also addressed management and superiority issues. Taking into consideration the small size of individual claims, the lack of other such litigation involving Kemper, the relative desirability of concentrating the litigation in New Mexico, and relying to some degree on the court's ability to adjust the class as the case progressed, the district court decided the certification was appropriate.

{24} The district court spoke at length about the difficulties posed by the nationwide reach of the class. The district court recognized that it faced choice of law issues with constitutional implications. Citing *Sollenbarger v. Mountain States Tel. & Tel. Co.*, 121 F.R.D. 417, 438 (D.N.M.1988), the district court decided it could entertain the action if the applicable law in other states was sufficiently similar to New Mexico's law, or if the law of New Mexico at least did not clearly contradict the law of the other forums. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 815, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The district court concluded, after reviewing the law surveys provided by the class, that there was sufficient uniformity in law to allow it to proceed with the contract and good faith and fair dealing claims. The district court apparently intends to apply New Mexico law to these claims. The district court did alert the parties that it retained jurisdiction to decertify or adjust the class as the case proceeded.

## ANALYSIS

### Standard of Review

■ {25} Appellate courts typically review a district court's decision to grant or deny class certification for an abuse of discretion. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1110 (10th Cir.2001); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D.Mich.2001); *Howe v. Microsoft Corp.*, 656 N.W.2d 285, 287–88 (N.D.2003); *In re S.D. Microsoft Antitrust Litig.*, 657 N.W.2d 668, 671 (S.D.2003). The district court abuses its discretion when it misapprehends the law, *New Mexico Right to Choose/NARAL v. Johnson*, 1999–NMSC–028, ¶ 7, 127 N.M. 654, 986 P.2d 450, or when its decision is unreasonable. *Bustamante v. City of Las Cruces*, 114 N.M. 179, 181, 836 P.2d 98, 100 (Ct.App.1992); *Wirth v. Commercial Res., Inc.*, 96 N.M. 340, 347, 630 P.2d 292, 299 (Ct.App.1981). If the district court has applied the correct law, we will uphold its decision if it is supported by substantial evidence. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132 (2d Cir.2001) (applying a deferential standard to certification ruling if the correct legal standard was applied); *Bustamante*, 114 N.M. at 181, 836 P.2d at 100 (noting the relationship between the abuse of discretion and substantial evidence standards).

■ {26} An abuse of discretion standard appropriately recognizes the practical, fact-bound, and case-specific nature of the class certification process. The judge who will handle the case is best able to craft the most efficient, manageable, and just means of providing all parties a reasonable forum and remedy. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 184–85, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (Douglas, J., concurring and dissenting in part) (discussing the relationship between the trial court's discretion and Rule 23's flexibility to manage the case); *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 140–41 (indicating that the certification issue is peculiarly within the discretion of the trial court as management is "always a matter of justifiable and serious concern for the trial court" and the trial court has a great deal of flexibility to manage the class as necessary) (internal quo-

tation marks and citation omitted); *State v. Ferguson*, 111 N.M. 191, 192–93, 803 P.2d 676, 677–78 (Ct.App.1990) (recognizing discretionary review is given to trial judge who is thought to be in a better position than appellate judges to decide certain matters wisely and justly). Thus, within certain parameters designed to encourage the district courts to explicitly consider and resolve the issues inherent in the class action vehicle, appellate courts should leave certification requests to the prudent discretion of the district courts.

### General Considerations

{27} Identical to its federal counterpart, Rule 1–023 currently provides in pertinent part:

A. **Prerequisites to a class action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

B. **Class actions maintainable.** An action may be maintained as a class action if the prerequisites of Paragraph A of this rule are satisfied, and in addition:

. . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(a) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(d) the difficulties likely to be encountered in the management of a class action.

C. **Determination by order whether class action to be maintained; notice; judgment; actions conducted partially as class actions.**

. . . .

(4) When appropriate:

(a) an action may be brought or maintained as a class action with respect to particular issues; or

(b) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.

Rule 1–023(A), (B)(3), (C)(4).

{28} The class action procedure has been in use for hundreds of years, starting with the English Equity courts. 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure Civ.2d* § 1751 (2004) (hereinafter Wright). The federal courts included a class action provision in the Equity Rules in 1833. *Smith v. Swormstedt,* 57 U.S. 288, 16 How. 288, 14 L.Ed. 942 (1853) (mem.). Class action practice was included in the new federal rules of civil procedure in 1938. Increasing dissatisfaction with the original Rule 23 led to the 1966 revision which forms the bulk of the rule as it stands today. *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 832–35, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999).

{29} Thus, the current rule is but the latest version of a series of provisions addressing the problem of how best to manage claims involving losses dispersed over large numbers of persons but caused by an arguably common agent. Class actions aggregate many claims into a single proceeding, potentially saving the courts from dealing with large numbers of individual claims involving

similar factual and legal patterns. Aggregation increases the chances that a claim will be heard when the small size of an individual's claim makes it uneconomic—and therefore unlikely—to be brought. The United States Supreme Court has recognized the protection of small claims as one of the prime purposes of the class action. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (noting that the advisory committee had "dominantly in mind vindication" of small individual claims).

■■■ {30} Aggregation, on the other hand, carries its own difficulties. The most obvious is the subjugation of individual claims with their unique elements to the aggregate. The result may be an increased potential for error in any given case. If the individual claim is relatively small, the perniciousness of error may be of small concern, but, as Rule 1–023(B)(3)(a) recognized, should loom larger as the relative size and consequence of each individual's claim increases. Similarly, homogeneity of the class must be considered in order to reduce intra-class conflicts. And, simple management of a class action can be a concern depending on the size of the class, its geographic reach, and the number and complexity of the factual and legal issues involved.

■■■ {31} At the far end of the spectrum, courts must guard against collusive pressure and behavior. Premature settlement of an action on terms favorable to class counsel in the form of fees and to the defendant in the form of a quick resolution, with no admission of liability but a broad definition of the class and the legal claims settled, is a problem courts must take into account in every settlement approval process.

{32} All of these problems have been highlighted over at least the last two decades by the increasing incidence of mass tort litigation. Cases involving nationwide classes sometimes numbering in the millions have presented unprecedented challenges to court resources and imaginations as they tackle issues as basic as identifying and notifying members of the class and as esoteric as deciding choice of law questions. *See Georgine v. Amchem Prods., Inc.,* 83 F.3d 610 (3rd Cir.1996) *aff'd,* 521 U.S. 591, 117 S.Ct.

2231, 138 L.Ed.2d 689 (1997) (decertifying a nationwide settlement class of all persons exposed to asbestos but not currently ill); *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 737 (5th Cir.1996) (decertifying a nationwide class including all nicotine-dependent persons, and their estates and living "spouses, children, relatives and 'significant others' " for a class period starting in 1943).

{33} The effects and causes of increasing class action litigation have received increasing attention from the courts, academia, and policy think tanks. *See Symposium: MASS TORTS,* 148 U. Pa. L.Rev. 1851–2274 (2000); *Class Actions in the Gulf South Symposium,* 74 Tul. L.Rev. 1603–2255 (2000); Deborah R. Hensler, et al., *Class Action Dilemmas: Pursuing Public Goals for Private Gain,* RAND Institute for Civil Justice (2000). These materials are but a small fraction of the scholarly attention given to the issue recently.

{34} The literature indicates that the courts have grown more cautious over the years about the class action vehicle. The early idea that courts should err on the side of granting certification, *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968), has been demonstrably tempered, at least in the mass tort arena. The Seventh Circuit has asserted that "[m]ost federal courts ... refuse to permit the use of the class-action device in mass-tort cases." *In re Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1304 (7th Cir.1995). This is not surprising in a sense given the potential for individual variations among tort plaintiffs with regard to liability and causation issues. In fact, the Advisory Committee that drafted the current version of Rule 23 noted that "mass accident [or mass tort]" cases are "ordinarily not appropriate" for class treatment. 39 F.R.D. 69, 103 (1966).

{35} However, concern over the use of class actions has spilled over to other types of cases. *See, e.g., Banks v. N.Y. Life Ins. Co.,* 737 So.2d 1275, 1282 (La.1999) (decertifying a so-called "vanishing premium" case class limited to Louisiana residents); *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 418 n. 12 (5th Cir.1998) (decertifying a Rule 23(b)(2) class asserting employment discrimi-

nation under the Civil Rights Act of 1991 and affirming the district court's refusal to certify the class under Rule 23(b)(3)).

{36} Further, states (such as Louisiana) formerly seen as relatively friendly to class actions have recently placed more stringent requirements on their certification processes. *See Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693–95 (Tex.2002) (decertifying action against software provider on theories of fraud, breach of express warranty, negligent misrepresentation, promissory estoppel, and deceptive trade practices because class could not demonstrate that individual issues of reliance did not preclude finding of predominance); *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425, 436 (Tex.2000) (adopting a stringent version of the federal approach to Rule 23 and decertifying a class action arising from a tank explosion); *Ex parte AmSouth Bancorporation*, 717 So.2d 357, 359 (Ala.1998) (per curiam) (decertifying class asserting fraud, securities fraud, breach of implied contract, and breach of fiduciary duties because claims rested on oral statements rather than documents); *Ex parte Green Tree Fin. Corp.*, 684 So.2d 1302, 1307–09 (Ala.1996) (decertifying a class due to a lack of evidentiary underpinnings for the finding required by the rule).

■ {37} We provide this background not because it is dispositive, but because it teaches that the mood across the country, in particular with regard to nationwide class actions, is marked by caution. *See Stromboe*, 102 S.W.3d at 699 nn. 91–92. No court has ruled that a nationwide class involving breach of contract and breach of the duty of good faith and fair dealing is impossible. *Indianer v. Franklin Life Ins. Co.*, 113 F.R.D. 595, 607 (S.D.Fla.1986) (noting "[i]t would be wrong to conclude that breach of contract claims are never appropriate for nationwide class treatment"). *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 n. 8, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (noting that "contract law is not at its core diverse, nonuniform, and confusing." (internal quotation marks and citation omitted)). But, when considering the propriety of such an action, courts should bear uppermost in mind whether the matter can be reasonably managed in such a way that the potential efficiencies of the class action tool are actually realized without trammeling the defendant's ability to develop its defenses.

{38} This background also provides context for the United States Supreme Court's few observations concerning the approach courts should take when considering class certification requests. In *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the court made clear that trial courts must conduct a "rigorous analysis" of a plaintiff's compliance with Rule 23(a) before ruling on any class certification. The Court did not elaborate on what a rigorous analysis would entail, but presumably it was reacting to the fact that the district court there had not conducted any kind of evidentiary hearing before certifying the class.

{39} The Supreme Court has also made it clear that the text of federal Rule 23 embodies real limits on "judicial inventiveness" in using the class action tool. *Amchem Prods., Inc.*, 521 U.S. at 620, 117 S.Ct. 2231. The rule provides safeguards, not just "impractical impediments" to case management. *Id.* at 621, 117 S.Ct. 2231. The Court in *Amchem Prods., Inc.* observed that Rule 23(b)(3) was seen as an "adventuresome innovation" that invited a close look before a case was accepted as a class action. *Id.* at 592–93, 117 S.Ct. 2231. Echoing the Supreme Court's observation that the policy objectives of the class action Rule "may be endangered by those who embrace [Rule 23] too enthusiastically just as [they are by] those who approach [the Rule] with distaste," we turn to the merits of the certification issue. *Id.* at 629, 117 S.Ct. 2231 (internal quotation marks and citation omitted).

### Rule 1–023(A)

■ {40} All class actions must meet the minimum requirements of Rule 1–023(A), commonly referred to as numerosity, commonality, typicality, and adequacy of representation. Kemper challenged each below and the district court found in favor of the class on each.

■ {41} Numerosity under Rule 1–023(A)(1) is concerned with joinder issues.

The primary considerations are whether there are so many potential plaintiffs that they cannot be joined as a practical matter, and whether there are other obstacles, such as personal jurisdiction issues, to individual joinder. Wright, *supra* § 1762. Kemper argues that the class has not proven how many of the 200,000 or so policy holders in the class actually agree with the theory of the case. Kemper's position apparently is that numerosity should depend on the number of class members who may ultimately seek a recovery. This is not an appropriate standard. *Weiss v. Tenney Corp.,* 47 F.R.D. 283, 289 n. 2 (S.D.N.Y.1969) (noting that numerosity is determined on basis of "who *might* have such a claim—and not the number of those who will ultimately recover"). Here, the sheer size of the class lends ample support to the district court's finding concerning numerosity.

{42} The commonality requirement of Rule 1–023(A)(2) is relatively easily met because it is deemed to require only that a single issue be common to the class. *Smith v. Behr Process Corp.,* 113 Wash.App. 306, 54 P.3d 665, 673 (2002); 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3.10 (3d ed.1992) (hereinafter Newberg). This low threshold is met here because the insurance policies and application forms at issue are essentially identical. As may be expected, the commonality requirement is usually subsumed by the predominance requirement of Rule 1–023(B)(3). *Amchem Prods., Inc.,* 521 U.S. at 623–24, 117 S.Ct. 2231 (noting that even if commonality is met, predominance "is far more demanding"); Wright, *supra* § 1763, at 227–28.

{43} The typicality requirement of Rule 1–023(A)(3) is used to gauge in general how well the proposed class representative's case matches the class factual allegations and legal theories. *Smith,* 54 P.3d at 673–74; Wright, *supra* § 1764; Newberg, *supra* § 3.13. The fit need not be perfect. If the alleged unlawful conduct affects both the named plaintiff and the class members, varying fact patterns in individual claims will not usually defeat typicality unless the variation is so great that there is a conflict created between the named parties and the class. Wright, *supra* § 1764, at 247.

{44} Kemper argues that Berry's claims are not typical because he admits he had to pay $1586 every six months—the modal premium set in his application—to keep his policy in force. Kemper also points out that Berry initially did not understand the significance of the APR allegation. The class responds with reference to other parts of the record, which seem to indicate that Berry understands the theory of the case, agrees with it, and believes he personally has a viable claim. Even assuming Kemper's assertions have some factual merit, we see no abuse of discretion in the district court's decision. The district court could reasonably rely on those portions of the record that support Berry's view of the case. *See Mersay v. First Republic Corp. of Am.,* 43 F.R.D. 465, 469 (S.D.N.Y.1968) (noting that named plaintiff need not prove every element of her individual claim to meet typicality requirement).

{45} Rule 1–023(A)(4) requires that the class representative "fairly and adequately protect the interests of the class." "What constitutes adequate representation is a question of fact that depends on the circumstances of each case." Wright, *supra* § 1765, at 271. On appeal, Kemper limits its argument to two factors: (1) Berry did not enter into a contingency fee agreement until more than a year after the case was filed, after Kemper raised the issue; and (2) Berry does not understand the claim. We have already noted that the district court had conflicting testimony as to the latter assertion. With regard to the fee agreement, we see no abuse of discretion, in particular since Kemper has not challenged in any way the competence or propriety of the class counsel.

### Rule 1–023(B)(3)

{46} Rule 1–023(B)(3) does not provide a definition of predominance or superiority. It does provide a list of "matters pertinent to the findings," but it does not explain how they are to be weighed in individual cases. *Id.* (B)(3)(a)-(d).

{47} As envisioned by the Advisory Committee, federal Rule 23(b)(3) class actions would encompass "those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." 39 F.R.D. at 102–03. These considerations suggest that courts should strive to achieve a reasonable balance between judicial convenience and the rights of the parties. Whether a case should be certified for class treatment is a fact-driven, pragmatic inquiry guided by the twin objectives of judicial efficiency and the need to provide a forum for the vindication of dispersed losses. *Amchem Prods., Inc.,* 521 U.S. at 617, 117 S.Ct. 2231; *Allison,* 151 F.3d at 420 (noting that the "most compelling rationale for finding superiority in a class action" is the existence of a "negative value suit" where the potential recovery by any individual is too small to pay the cost of the suit) (internal quotation marks and citation omitted); Wright, *supra* § 1778, at 528. The end goal of the predominance inquiry is to determine whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.,* 521 U.S. at 623, 117 S.Ct. 2231.

{48} Clearly, the inquiry cannot be reduced to a formula, but, generally, predominance may be found when the "issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." *Rutstein v. Avis Rent–A–Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir.2000) (internal quotation marks and citation omitted). Common questions "need not be dispositive" of the entire case; they need only predominate. *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. at 339 (internal quotation marks and citation omitted); Wright, *supra* § 1778, at 528–29. And, predominance is not determined by a simple quantitative measure of the time that may be spent on common rather than individual issues, though that calculation can be a

factor properly taken into account. *Id.* at 527.

{49} Stated in the abstract these tests for predominance have a circular, if not ad hoc, flavor to them. They serve primarily to remind courts that the inquiry should focus on the relationship between common and individual issues. That relationship can only be measured in the context of particular cases. *See In re Potash Antitrust Litig.,* 159 F.R.D. 682, 693 (D.Minn.1995) (noting there are no bright lines to determine when common questions predominate in a particular case); *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1039 (N.D.Miss.1993) (noting that "suitability for Rule 23 certification is, by design and necessity, a fact sensitive process for each case").

{50} Because of the need to measure in context, courts recognize that the "class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau,* 371 U.S. 555, 558, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963)). This "probe behind the pleadings" is necessary because the district court must understand the elements of the plaintiffs' causes of action—and the likely defenses—in order to assess what kind of proof will be necessary to decide the issues. Knowing what proof will be necessary allows the district court to assess the extent to which evidence common to the class is potentially available to meet a plaintiff's burden or whether individualized proof will be necessary. Similarly, understanding the potential defenses to liability should help the district court assess the extent to which the defendant may be entitled to insist on presenting individualized proof. The focus for the district court is whether the proof at trial will be predominantly common to the class or primarily individualized. *In re Polypropylene Carpet Antitrust Litig.,* 996 F.Supp. 18, 23 (N.D.Ga.1997)

{51} This peek into the merits of the case—without deciding them [2]—should

---

2. It is clear that certification is not an appropriate time to examine or decide the substantive

merits of the case. *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d at 135; *Anderson v.*

be relatively straightforward if the court is dealing with the law of only one state. The inquiry can become decidedly more involved, however, if the law of different states must be determined and applied. Here, the district court certified a nationwide class. The difficulties posed by multistate classes are of three general varieties. First, multistate classes bring into sharp focus the Rule 1–023(B)(3)(c) requirement that courts consider the relative desirability of concentrating litigation in the particular forum. Second, the district court must ascertain what the law governing the cause of action in each state actually is and compare it with the forum state law. Having completed this difficult task, the court must decide which law to apply. Applying the wrong law raises problems of constitutional dimension. *See Phillips Petroleum Co.,* 472 U.S. at 815–23, 105 S.Ct. 2965 (holding that it was improper to apply the law of the forum state to all issues and members in a class action in the face of conflicting substantive features unless the forum state had sufficient contact with the members of the class located in other states to satisfy due process requirements). Third, if the forum state decides to apply the law of other states, the court must consider the difficulty of managing the trial of sub-classes to the same jury. *See Ilhardt v. A.O. Smith Corp.,* 168 F.R.D. 613, 619–20 (S.D.Ohio 1996) (detailing the difficulties potentially encountered at trial of a case where multiple state laws must be applied). *See* Stephen R. Bough & Andrea G. Bough, *Conflicts of Laws and Multi–State Class Actions: How Variations in State Law Affect the Predominance Requirement of Rule 23(B)(3),* 68 UMKC L.Rev. 1 (1999).

{52} We turn now to consider whether the district court properly considered these concerns and whether it abused its discretion in its decision.

### A. Breach of Contract Predominance Inquiry

{53} We start the predominance analysis by examining how the parties intend to litigate the case with particular attention to the evidence they intend to introduce. This initial discussion will rely solely on New Mexico insurance contract law since the district court assumed that was the law it would be applying. We will address the propriety of that decision in a later section of the opinion.

{54} Plaintiff's position is that the class can prove its case without individualized evidence. In fact, Plaintiff argues that it would be improper to admit individual evidence, citing Restatement (Second) of Contracts § 211(2) (1981) (providing that standardized agreements are to be "interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing"). Plaintiff emphasizes that all of the documentary evidence is essentially identical for the entire class; that is, the policy language (outlined above and attached as Appendix A), the application forms, the agent training, and sales materials are all the same and do not require individual explanation. In Plaintiff's view the meaning of these standardized forms must be common to all of the class members.

{55} Further, Plaintiff argues that the policy can and should be interpreted in favor of the class without resort to individual testimony. Plaintiff notes that the district court has not yet decided whether there is an ambiguity in the standardized forms, and that the question of ambiguity—or, more precisely, conflicting reasonable interpretations—is not before this court. Plaintiff envisions a procedure in which the district court will "use accepted canons of contract construction, and 'traditional rules of grammar and punctuation' . . . in determining whether an ambiguity exists and in determining how to resolve it." If the district court finds an ambiguity, Plaintiff expects the district court to resolve it by the "universally recognized principle that ambiguity is always to be construed against the drafter, in this case Kemper."

{56} Kemper has two approaches to the issue of interpretation. It first argues that the policy, including the application, unambiguously sets the amount of the premium no matter what mode is chosen by the insured. That is, insureds cannot reasonably assert

*City of Albuquerque,* 690 F.2d 796 (10th Cir. 1982).

they did not understand the obligation to make premium payments at the level set in their applications for the mode chosen. In this view, the fact that the figure given in the policy for "Current Premiums After First Policy Year" does not match the modal premium is simply irrelevant or clearly not applicable to non-annual payees. As a back-up position, Kemper argues that if the policy is ambiguous it must be allowed to present extrinsic evidence to prove that individual insureds share its view of the meaning of the policy. Kemper has not as yet presented any evidence from any insured. It did provide the four agent affidavits described above.

{57} In sum, Plaintiff and Kemper offer polar views of the case and the likely course of the litigation. We believe the litigation is more likely to take a middle course, though Plaintiff may be a bit closer to the mark.

{58} New Mexico case law indicates that insurance contracts should be construed in the same manner as other contracts. *Rummel v. Lexington Ins. Co.*, 1997–NMSC–041, ¶ 18, 123 N.M. 752, 945 P.2d 970. The insurance contract will be reviewed as a whole, starting, of course, with the language of the agreement itself. *Id.* ¶ 20. The traditional rules of presentation, syntax, and grammar should be employed in the normal course of interpretation. *Id.; C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 510 n. 5, 817 P.2d 238, 244 n. 5 (1991).

{59} Of course, language is at times difficult to understand. These difficulties of interpretation—generically referred to in the cases as ambiguities—can arise in a variety of circumstances, such as "when separate sections of a policy appear to conflict with one another, when the language of a provision is susceptible to more than one meaning, when the structure of the contract is illogical, or when a particular matter of coverage is not explicitly addressed by the policy." *Rummel*, 1997–NMSC–041, ¶ 19, 123 N.M. 752, 945 P.2d 970. These examples are not necessarily discrete phenomena; that is, they may overlap within the same sentence, paragraph, or section of a policy. All are simply examples of lack of clarity in the expression of the agreement.

{60} Whether a policy is reasonably susceptible to different interpretations is a question of law to be determined by the court. *C.R. Anthony Co.*, 112 N.M. at 509, 817 P.2d at 243. An ambiguity is not established simply because the parties disagree on the proper interpretation. *Trujillo v. CS Cattle Co.*, 109 N.M. 705, 709, 790 P.2d 502, 506 (1990). Reasonableness is the touchstone for determining whether there is a true lack of clarity. *Id.*

{61} The concept of reasonableness has a somewhat specialized meaning in the insurance context, however. When evaluating competing interpretations of a policy, the courts should view the language issue from the standpoint of "a hypothetical reasonable insured." *Computer Corner, Inc. v. Fireman's Fund Ins. Co.*, 2002–NMCA–054, ¶¶ 7, 13, 132 N.M. 264, 46 P.3d 1264; *see also Rummel*, 1997–NMSC–041, ¶ 19, 123 N.M. 752, 945 P.2d 970. Thus, the question the court should ask itself initially is what understanding a reasonably intelligent, non-lawyer lay person might glean from the policy, in light of the usual meaning of the words and the circumstances leading to purchase of the policy. *Id.* Specialized knowledge of the insurance industry case law, academic treatments, and industry norms or standards should not enter into the inquiry. *Computer Corner Inc.*, 2002–NMCA–054, ¶¶ 7, 13, 132 N.M. 264, 46 P.3d 1264.

{62} Confronted with assertions of conflicting interpretations, the court should look first to the language itself. If the language is plain enough "that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." *Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). Absent such clarity, or in aid of the basic inquiry as to whether there is a reasonable conflict in interpretation, courts may accept extrinsic evidence of the circumstances surrounding entry into the agreement. In this regard we disagree with Plaintiff's argument that the Restatement (Second) of Contracts § 211(2) would preclude introduction of any evidence concerning specific conversations between insureds and their agents concerning modal premium

differentials and how they would operate in light of the provision of the policies. Section 211(2) does not require such an outcome and we see no reason to change New Mexico's settled approach to contract interpretation here.

{63} If the parties do not offer extrinsic evidence probative of the issue, the court may proceed to resolve the conflict as a matter of law. *Mark V, Inc.*, 114 N.M. at 782, 845 P.2d at 1236. As we noted in *Computer Corner, Inc.*, "[i]f we are alerted to an interpretation supporting coverage to which the language of the policy is reasonably susceptible and which does not violate public policy, we generally will construe the provision against the insurer and in favor of coverage." 2002–NMCA–054, ¶ 7, 132 N.M. 264, 46 P.3d 1264.[3] This can have powerful consequences given New Mexico's commitment to meeting the reasonable expectation of insureds. *Computer Corner, Inc.* is an example of a case in which, apparently, no extrinsic evidence about the circumstances surrounding issuance of the policy was available. It is reasonable to assume that there were in fact no conversations between Fireman's Fund and its insured about what the "Intentional Acts" or "Business Risk" exclusions meant. The result in *Computer Corner, Inc.* was a change in the policy itself, at least from the insurer's viewpoint.

{64} This outcome is appropriate and just in this context because of the nature of the insurance transaction. Policies are difficult, technical documents. And lack of communication about the specific policy language is typical, in particular in purely consumer transactions, where the usual practice is to deliver the actual policy sometimes weeks after coverage is extended and the premium paid. The policy when delivered is a form created by the insurance company and not subject to negotiation. Enforcement of the hypothetical insured's reasonable expectations acts as an alert to insurers to clarify the language of their policies. *Id.*

{65} This process has obvious implications for class actions. It is possible to litigate

actions such as this purely on the basis of the common documents and other common evidence. That is how the class apparently intends to proceed. However, Kemper also has the right to try and prove as an affirmative defense that specific insureds shared its idea of what the agreement was with regard to the premium structure. Parties to a contract should always have the opportunity to prove where their minds actually met.

{66} Kemper goes a bit further. It asserts that this right in and of itself precludes a finding of predominance in favor of the class because it makes each class member's case an inherently individual matter. We do not agree. On a factual level, the district court only had the four agents' affidavits as extrinsic evidence. The district court could interpret the affidavits as indicating that at least some of the class members received information about the modal premium cost differential, though none of the affidavits addresses whether the "Guaranteed Maximum Premiums" language in the policy form was explained to the policy owners. However, we do not believe the district court abused its discretion in deciding that this factual showing was not sufficient to overcome the factors it saw supporting its decision that common questions predominated. Of course, Kemper would be free to augment its showing in an attempt to demonstrate that individual inquiries will in fact reach a critical mass that swamps the common questions.

{67} Finally, we simply disagree with Kemper's argument that its affirmative defense of waiver by performance—that is, that all insureds continue to pay their modal premiums—requires individual hearings. In a case such as this, where the crux of the claim is a lack of adequate information because it is not included in standardized documentation, the effect of continued performance is most appropriately dealt with as a common question. The analysis is potentially different, as we shall see, where the claim relies on misinformation given in individual transactions.

**3.** We appreciate that *Computer Corner, Inc.* involved coverage issues. We do not believe that diminishes its applicability to other policy issues.

## B. Implied Good Faith Duty to Disclose Claim

{68} Plaintiff pleads the good faith and fair dealing claim in the First Amended Complaint as follows:

"Kemper's ongoing concealment and failure to state or disclose the dollar difference and the annual percentage rate and/or annual rate of interest which Berry and its other policyholders have been required to pay constitutes a breach of Kemper's duty of good faith and fair dealing in its performance under its policies." [4]

Plaintiff argues that this claim is provable by essentially the same common evidence applicable to the breach of contract claim; that is, the documentary forms are all essentially identical and Kemper admits that none of the forms or sales manuals explicitly discloses the dollar amounts of the modal premium differentials. Kemper also admits that none of its materials provide any way to calculate an APR or interest rate interpretation of the differential. And, Plaintiff presented expert testimony concerning the value to consumers of such information.

{69} Kemper argues that the duty to disclose cases inherently require individual consideration and resolution because the "core issues" in such cases "are whether the plaintiff was in fact aware of the information that allegedly was concealed, and if not, whether the information would have mattered to the plaintiff if it had been provided." We will refer to the two concerns as the "awareness" and the "materiality" issues.

{70} The awareness issue is subject to the same analysis as the breach of contract claim. There are significant indicators of common conduct that can be proven by common evidence. The evidence of diverse facts—agent's affidavits—could reasonably be viewed by the district court as not significant enough to threaten the predominance of the common issues. From this standpoint, we see no abuse of discretion.

{71} We are not persuaded by Kemper's blanket assertion that failure-to-disclose cases are uniformly refused certification. Kemper relies heavily on a number of so-called "vanishing premium" cases. Review of the cases reveals a pattern of non-uniform documentary material and reliance on misrepresentations at their factual core. Given the clearly disparate information provided to the putative class members, these courts were understandably reluctant to proceed by class action. See Keyes v. Guardian Life Ins. Co., 194 F.R.D. 253, 256 (S.D.Miss.2000) (refusing to certify class where court found that substantially nonstandardized sales presentations to insureds were involved); Adams v. Kan. City Life Ins. Co., 192 F.R.D. 274, 278–79 (W.D.Mo.2000) (refusing certification where court found that agents did not receive uniform training, use uniform sales scripts, use uniform policy illustrations, or distribute uniform marketing materials); Cohn v. Mass. Mut. Life Ins. Co., 189 F.R.D. 209, 214–17 (D.Conn.1999) (refusing certification because of insufficient showing of uniformity in sales materials or oral presentations); In re Hartford Sales Practices Litig., 192 F.R.D. 592, 606 (D.Minn.1999) (denying class certification where plaintiff relied on breach of oral promises made by sales agents).

{72} Other courts have certified class actions in vanishing premium cases where the plaintiffs did not rely on oral misrepresentations as the factual basis of their claim. These courts decided that this narrowing allowed for reasonable control of individual issues. See Varacallo v. Mass. Mut. Life Ins. Co., 332 N.J.Super. 31, 752 A.2d 807, 816 (Ct.App.Div.2000); In re Great S. Life Ins.

---

4. After the briefing in this Court was almost completed, this Court issued two other cases involving modal premium claims. Smoot v. Physicians Life Ins. Co., 2004–NMCA–027, 135 N.M. 265, 87 P.3d 545 and Azar v. Prudential Ins. Co., 2003–NMCA–062, 133 N.M. 669, 68 P.3d 909. These cases may have an impact on the good faith and fair dealing claim here. However, with one exception, we will not attempt to decipher that impact in the first instance. The potential effect, if any, of Smoot on the merits of this case particularly are better considered initially by the district court. The one exception is the reiteration in Azar that a good faith and fair dealing claim will not lie for any conduct occurring before a contract is entered into. Id. ¶ 53. That holding is clear enough to be readily applied here without further argument. Thus, our discussion about Plaintiff's good faith and fair dealing claim will assume it is limited to a duty to disclose during the life of the policy. Plaintiff does not argue otherwise.

*Co. Sales Practices Litig.*, 192 F.R.D. 212, 216 (N.D.Tex.2000) (certifying class that relied on omissions from uniform sales literature as the factual basis of claims); *Cope v. Metro. Life Ins. Co.*, 82 Ohio St.3d 426, 696 N.E.2d 1001, 1005–06 (1998) (certifying class where gravamen of complaint was that defendant intentionally omitted certain state-mandated warnings from uniform sales material and class did not rely on oral or affirmative misrepresentations). On balance we believe Plaintiff's case is more closely related to the cases granting certification. We do not see any abuse of discretion by the district court in viewing the case that way.

{73} The materiality issue is of a different nature, perhaps because of the way the covenant of good faith is being used here: to impose a duty of disclosure. It is unclear to us (though not necessary to resolve here) which provision of the policy gives rise to this duty to disclose. In the more typical case the covenant of good faith springs from a wrongful failure to properly perform under a policy provision (e.g. the obligation to defend or pay a claim) or from an improper exercise of a clause. UJI 13–832 NMRA 2004 Comm. cmt.

{74} Nevertheless, the parties agree about the basic nature of the claim here. Kemper analogizes the materiality question here to the issue of reliance in fraud cases. We glean this observation from the fact that the cases Kemper cites to support the existence of the issue are fraud claims. *See Lotspeich v. Golden Oil Co.*, 1998–NMCA–101, ¶ 9, 125 N.M. 365, 961 P.2d 790; *Parker v. E.I. DuPont de Nemours & Co.*, 121 N.M. 120, 132, 909 P.2d 1, 13 (Ct.App.1995). Kemper argues that this aspect of the case necessarily makes liability individual and fact-specific— similar to its argument about the need to get transaction-specific evidence in the breach of contract claim.

{75} Treating the materiality issue as akin to reliance—as Kemper appears to do—we believe the proper response is that materiali-

ty, like reliance, is properly presumed here. Like proving a negative, it is obviously difficult to prove that one relied on the fact that something was not disclosed. Or, put another way, it would be an unrealistic burden on a plaintiff to prove how he would have acted if the omitted material information had been disclosed. This concept underlies those cases which impose a presumption of reliance "where a defendant makes materially misleading omissions." *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 683 N.Y.S.2d 179, 198 (N.Y.App.Div.1998). A court may presume reliance where it is logical to believe that a reasonable person—or insured—would attach importance to the omitted fact in his choice of action on the transaction in question. *Spark v. MBNA Corp.*, 178 F.R.D. 431, 435–36 (D.Del.1998) (certifying a class of credit card holders against card issuer and applying a presumption of reliance on material contained in advertised offer). Plaintiffs presented expert testimony describing the value to consumers of disclosing dollar differential between modes and their interest equivalents. This evidence is sufficient to support a presumption that the undisclosed matter would be important to the reasonable insured. Thus, in cases involving primarily a failure to disclose, it is unnecessary to provide positive proof of reliance, or, in Kemper's formulation, that it "mattered."[5] *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (applying federal securities statute); *In re Great S. Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. at 220; *Steiner v. Southmark Corp.*, 734 F.Supp. 269, 272 (N.D.Tex. 1990); *Rael v. Am. Estate Life Ins. Co.*, 79 N.M. 379, 382, 444 P.2d 290, 293 (1968) (holding that materiality of medical information withheld from insurer could be presumed material to insurer); *Cope*, 696 N.E.2d at 1008.

## C. Conflict of Laws

[48] {76} In *Phillips Petroleum Co.*, 472 U.S. at 821–22, 105 S.Ct. 2965, the United

---

**5.** We recognize that in *Azar* we reversed summary judgment in favor of the plaintiffs because there were issues of material fact related to whether the modal premium differentials constituted material information that the insurer had a duty to disclose. 2003–NMCA–062, ¶¶ 71–73, 133 N.M. 669, 68 P.3d 909. However, the plaintiffs in *Azar* did not make the argument that materiality should be presumed.

States Supreme Court held that the Full Faith and Credit Clause (Art. IV, § 1) and the Due Process Clause of the Fourteenth Amendment limit a forum state's ability to apply its own law when dealing with multistate class actions. Drawing a distinction between a state's power to assert jurisdiction over a multistate class and the law it could apply, the Supreme Court held that if there is a conflict with another state's law, the forum state must have a " 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [its] law is not arbitrary or unfair." *Id.* (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981)). The opposite corollary to the rule, of course, is that "[t]here can be no injury in applying [the forum's] law if it is not in conflict with that of any other jurisdiction connected to this suit." *Id.* at 816, 105 S.Ct. 2965.

{77} In *Phillips Petroleum Co.*, the Supreme Court reversed the Kansas Supreme Court's decision to apply Kansas law to decide whether interest was due to all claimants on withheld royalty payments because of potential significant conflicts it found with Texas and Oklahoma law. On remand, the Kansas courts reviewed their prior decisions in light of *Phillips Petroleum Co.* and held once again that it was appropriate to apply a uniform interest rate because there was no clear indication that the other states would not apply the rate in accord with the Kansas approach. *Wortman v. Sun Oil Co.*, 241 Kan. 226, 755 P.2d 488, 490–91 (1987) (relying on *Phillips Petroleum Co.*, 732 P.2d at 1290). On certiorari once again, the United States Supreme Court refused to second-guess the Kansas Court's approach to the issue, holding:

> To constitute a violation of the Full Faith and Credit Clause or the Due Process Clause, it is not enough that a state court misconstrue the law of another State. Rather, our cases make plain that the misconstruction must contradict law of the other State that is clearly established and that has been brought to the court's attention.

*Sun Oil Co. v. Wortman*, 486 U.S. 717, 730–31, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988).

{78} Together, *Phillips Petroleum Co.* and *Wortman* teach that courts dealing with multistate class actions must consider and evaluate how the laws of other states apply to the class claims. The forum state cannot simply assume that its law will govern. In this context, conflicts of law are potentially of constitutional dimension. On the other hand, the forum court will not commit constitutional error if it simply misconstrues the law of the other states. Neither is the forum court required to try to match or divine the result of the case as if it were being decided in the other states. The forum court is only bound by "clearly established" law brought to its attention. *Sun Oil Co.*, 486 U.S. at 731, 108 S.Ct. 2117.

{79} The implications of *Phillips Petroleum Co.* and *Wortman* for the predominance inquiry are clear. The more different laws are applicable, the more difficult it will be to say that common issues of law apply. On a practical level, the more variations in law there are, the more difficult it will be to conduct the trial. At some point— we cannot say where—the likely confusion to the jury of considering different jury instructions reflecting different laws becomes unmanageable and unfair. These potential difficulties implicate Rule 1–023(B)(3)(c) and (d) in particular, and must be addressed in each case. However, we do not join those courts which have expressed an "unfriendly skepticism" about class actions as an acceptable litigation tool. *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 421 (E.D.La.1997) (refusing to certify a nationwide class action in part because of perceived variation in state law as to negligence and products liability claims). Our approach is neither favorable nor antagonistic. Rather, we will take a pragmatic approach of reviewing each case on its own merits as to its feasibility and appropriateness for class treatment. *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 293 (S.D.Ohio 1997) (certifying a nationwide class medical monitoring class).

{80} Plaintiffs bear the burden of demonstrating that a case is appropriate for

class treatment. It is the plaintiffs' responsibility in the first instance to provide the district court with appropriate law surveys for each state included within the proposed class definition. The surveys should be detailed enough to show the current state of the law in each state with regard to the legal claims subject to certification. If the law is not uniform and consistent with New Mexico law, plaintiffs must catalog the differences and provide the district court with a plan for managing the differences through trial. If defendants disagree with the plaintiffs' survey results, or interpretations, it is incumbent on defendants to inform the district court of any errors they perceive. The district court cannot be faulted if "clearly established" contradictory law is not brought to its attention. *Wortman,* 486 U.S. at 730–31, 108 S.Ct. 2117. Generalizations about the general state of the law will not do, whether presented by plaintiffs or defendants.

{81} In this case, Plaintiff provided the court with nationwide surveys of the law covering breach of contract in the insurance context and the duty of good faith and fair dealing.[6] The district court relied on the surveys to decide that the law across the country was uniform and essentially identical to New Mexico's law. The district court determined it would litigate these two claims under New Mexico law. We turn now to evaluate whether the district court properly evaluated the effect of the law surveys under the standards earlier discussed.

## 1. Breach of Contract

{82} We have reviewed Plaintiff's breach of contract survey in light of our explanation of New Mexico law and in view of the constitutional standard of *Phillips Petroleum Co.* and *Wortman.* We are convinced that the district court did not err in its assessment that the law in this area is uniform enough that our traditional notions of fair play and

justice would not be offended by litigating the issue under New Mexico law. We simply see no significant variation in the cases from the standard approach to interpretation of insurance contracts: starting with plain language and progressing through rules of grammar, consideration of context and extrinsic evidence and ending, if necessary, with construction favoring the insured, if other approaches fail. This final step is an expression of contra proferentem which "all courts unanimously" apply. 2 Eric Mills Holmes & Mark S. Rhoades, *Holmes Appleman on Insurance, 2d,* § 6.1, at 134 (1996); *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 539 (9th Cir.1990) (noting contra proferentem to be "the most familiar expression in the reports of insurance cases") (citing 2 G. Couch, et al., *Couch on Insurance 2d* § 15:74, at 334 n. 6 (rev. ed.1984) (internal quotation marks omitted)).

{83} We will respond to each of Kemper's specific arguments in turn. First, we acknowledge there are a number of cases refusing certification based on "variations in state contract law." We have already discussed the mass tort cases and their effect on class actions generally. Some of the contract claim cases cited by Kemper are examples of the "unfriendly skepticism" attitude we have already rejected. *See Ex parte Green Tree Fin. Corp.,* 723 So.2d 6, 11 (Ala. 1998) (reflecting "grave concerns as to whether any national class of plaintiffs" can satisfy the predominance requirement). Other cases, Kemper simply misinterprets. For example, the court in *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.,* 95 F.R.D. 168, 178 (D.Del.1982) did not "determine" that Delaware law differs from other states; it assumed it did without any attempt at analysis. Forecasting conflicts issues which it did not detail, and predicting that individual factual issues would inform the legal analysis, the court decided it would not attempt a class action.[7] Our approach is

---

6. Plaintiffs also provided surveys covering fiduciary duties and unfair trade practice statutes. The district court refused to certify these claims for class treatment in part because it was not satisfied that the law was sufficiently uniform to allow for reasonable management of the claims. The district court was thus clearly aware of the problems created by non-uniform law.

7. On motion for reconsideration, the court in the Coca–Cola litigation in fact certified a class with regard to the interpretation of earlier consent decrees and whether defendant had violated the consent decrees. *See Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.,* 98 F.R.D. 254 (D.Del.1983).

that the analysis must be conducted and then a decision made. That is what the district court did here.

{84} Second, Kemper asserts that there are different rules among the states as to the "ramifications of a party's performance of a contract." We have already noted that this defense is most properly dealt with as a common defense. We see no difference in the cases concerning the requirements for giving effect to a particular interpretation of a contract based on continued performance; that is, the purported interpretation must be based on "knowledge of the nature of the performance." Restatement (Second) of Contracts § 202(4) (1981). Because the claims center on the charge that standardized forms omitted key information, the district court can make a collective determination as to whether the forms imparted the necessary "knowledge" to find waiver by performance.

{85} Third, Kemper asserts generally that contra proferentem as applied varies from state to state. We have already noted that our review reveals no significant variation from the interpretative approach stated above, certainly none calling into play the constitutional concerns evinced by *Phillips Petroleum Co.* and *Wortman.* To the extent Kemper asserts that Maryland does not follow contra proferentem, it is mistaken. The case Kemper cites, *Bushey v. Northern Assurance Co.,* 362 Md. 626, 766 A.2d 598, 600–01 (2001) actually provides a thumbnail overview of Maryland's rules for interpreting insurance policies which would fit comfortably in any New Mexico case on the subject. Its one proviso is that policies will not be construed "most strongly" against the insurer. *Id.* at 601. That comports with New Mexico's standard that any construction must be reasonable in the context of each case. *Rummel,* 1997–NMSC–041,¶¶ 21–22, 123 N.M. 752, 945 P.2d 970. We see no constitutionally significant difference.

{86} Fourth, Kemper argues that there is "significant divergence among the States as to the use of extrinsic evidence" when construing a contract in that some states require its admission while New Mexico seems to allow discretion. We have reviewed the three cases Kemper cites. *Rockstad v. Global Fin. & Inv. Co.,* 41 P.3d 583 (Alaska 2002) (involving a real estate lease); *Morey v. Vannucci,* 64 Cal.App.4th 904, 75 Cal.Rptr.2d 573 (1998) (involving a contract for sale of a concrete plant); *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229 (Colo.1998) (involving use of extrinsic evidence to interpret a deed). We see no difference between the rules stated in them and New Mexico's—as well as other states'—approach to the issue under *C.R. Anthony Co.* and *Mark V, Inc. Hoggard v. City of Carlsbad,* 121 N.M. 166, 169–70, 909 P.2d 726, 729–30 (Ct.App.1995), where the district court heard extrinsic evidence and simply decided it was not helpful, is not to the contrary.

{87} Fifth, Kemper asserts there are differences in the application of the reasonable expectations doctrine, citing two cases where states have rejected it. *Allstate Ins. Co. v. Mangum,* 299 S.C. 226, 383 S.E.2d 464, 466–67 (Ct.App.1989); *Sterling Merch. Co. v. Hartford Ins. Co.,* 30 Ohio App.3d 131, 506 N.E.2d 1192, 1195–96 (1986). Our review of these cases indicates they reject the most muscular version of the doctrine where court action may result in essentially a new contract of insurance being imposed. We do not believe that version of the doctrine has been accepted in New Mexico as such. In New Mexico, reasonable expectations is more a particular version of contra proferentem than a separate doctrine. Thus, we see no fatal contradictions of law. In addition, if litigation appears to be heading toward a request to utilize the doctrine in its most virulent form, the district court can and should reevaluate the certification issue with regard to these states.

{88} Sixth, Kemper asserts that whether the policy would be deemed ambiguous "could" vary from state to state. There are two responses to this concern. First, the decision about ambiguity as to Kemper's policy has yet to be made in this case, and, second, we see no significant variation among the states concerning how that decision is made. Kemper speculates that in a "four corners" jurisdiction where ambiguity is decided solely on the basis of the document, it might win a motion to dismiss. However,

there is no need to forecast how the inquiry would actually be resolved in any other court because the case is here, and the decision is to be made here in accordance with reasonably uniform rules.

### 2. Good Faith and Fair Dealing

{89} Plaintiff's good faith and fair dealing claim appears to be of a slightly different order from the contract claim with regard to uniformity of the law. There do seem to be variations in the way a few states define and apply their version of the duty of good faith, which preclude application of New Mexico law across the board, and Plaintiff concedes as much.

{90} For example, it is fair to read the cases in Arkansas, Indiana, and Connecticut to require a level of conduct much more wrongful than required in New Mexico to state a cause of action. *See Aetna Cas. & Sur. Co. v. Broadway Arms Corp.*, 281 Ark. 128, 664 S.W.2d 463, 468 (1984) (Hickman, J., concurring in part, dissenting in part); *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 687 A.2d 111, 122 (1996); *Hoosier Ins. Co. v. Audiology Found. of Am.*, 745 N.E.2d 300, 310 (Ind.Ct.App.2001). We disagree with Kemper that New Jersey is among these states. The description of the duty of good faith given in *Seidenberg v. Summit Bank*, 348 N.J.Super. 243, 791 A.2d 1068, 1078–79 (Ct.App.Div.2002) is indistinguishable from New Mexico's. However, we will allow Kemper to try and convince the district court otherwise on remand.

{91} We also agree that there is a question whether Delaware's definition of the duty is similar to New Mexico's. *Corporate Prop. Assocs. 6 v. Hallwood Group Inc.*, 792 A.2d 993, 1002–03 (Del.Ch.2002) does seem to include an added element that the covenant will be applied only when it is clear from the express agreement that the parties would have proscribed the challenged conduct if they had dealt with it more clearly in the contract documents. Again, we leave it to the district court to deal with the specifics of how to resolve this difference in the context of this class action. We disagree that Nevada is in this camp. In our view, the description of the duty of good faith found in *Morris*

*v. Bank of America Nevada*, 110 Nev. 1274, 886 P.2d 454, 457 (1994) is entirely consistent with New Mexico law.

{92} We disagree with Kemper's other assertions of legal variation. Kemper cites two cases for the proposition that in "several" states the implied covenant does not create a duty of disclosure. Both are distinguishable on their facts, *Perez v. Citicorp Mortgage, Inc.*, 301 Ill.App.3d 413, 234 Ill. Dec. 657, 703 N.E.2d 518, 525 (1998) involved a mortgagee's claim that his mortgagor owed him a duty to disclose how private mortgage insurance (PMI) payments could be stopped. The court found there was no provision requiring disclosure in the mortgage; rather, the mortgage required PMI payments ostensibly for the life of the loan. And, the court found no other basis in the nature of the relationship to otherwise require disclosure. This situation says little if anything about the role of the duty of good faith in the insurance context. *Saint Alphonsus Reg'l Med. Ctr., Inc. v. Krueger*, 124 Idaho 501, 861 P.2d 71, 79 (Ct.App.1992), is another commercial, arms-length construction contract case not involving insurance. Interestingly, however, Idaho's description and application of the duty of good faith in the insurance context is indistinguishable from New Mexico's. *See White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 730 P.2d 1014 (1986).

{93} Kemper argues that some states use the duty only to govern a party's exercise of discretion under a contract where the contract expressly confers discretion. Kemper has simply misread the two cases it cites. The issue in the cases Kemper relies on was whether the grant of discretion obviated application of the duty of good faith. In each case the court essentially said "no, it depends on how the discretion is exercised." Thus, the cases strengthen Plaintiff's position. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395, Pension Trust Fund*, 201 Ariz. 474, 38 P.3d 12, 30 (2002); *Olympus Hills Shopping Ctrs, Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 450 (Utah Ct.App.1994).

{94} In sum, the law related to the duty of good faith is not sufficiently uniform to allow New Mexico law to be applied nationwide.

Certification on this issue will be reversed and the case remanded for reconsideration under the principles stated in this opinion.

### Superiority

{95} The other general consideration under Rule 1–023(B)(3) is whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Kemper has not addressed the superiority inquiry in its Brief, choosing to emphasize predominance. While we do not wish to view the lack of attention as a waiver of the issue—since they are intertwined—neither will we dwell on the question.

{96} Subject to the district court's reconsideration of the duty of good faith, we see no problems with superiority. We will use the four "matters pertinent to the findings" as our organizing point:

1. Given the potentially small value of individual claims, we do not believe that class member interest in controlling their own claims is strong. Rather, the relatively small value argues in favor of the class action vehicle. Rule 1–023(B)(3)(a).

2. The parties have not cited any other cases asserting these claims against Kemper; thus, there is no competition or danger of undue burden from duplicative litigation. Rule 1–023(B)(3)(b).

3. The relative desirability of concentrating the litigation in New Mexico is implicit subject to this opinion thus far. Here the question of predominance overshadows other concerns. If the district court reasonably believes the cause can be efficiently handled by his court, and the parties believe New Mexico is a suitable forum, we will generally accede to the district court's decision. Rule 1–023(B)(3)(c).

4. The difficulties of management are again intertwined with the issue of predominance. If the desired efficiencies which are the raison d'etre of class action will be difficult to achieve because of proliferation of individual inquiries, certification may not be appropriate. In this regard it would be extremely helpful if the class would prepare a plan for litigation of the case through trial. Such a plan would help focus all parties on the actual potential difficulties in managing the case. Simple management difficulties in an otherwise appropriate case will rarely result in non-certification.

{97} In this case we have no litigation plan as yet. However, we have found that common questions predominate as to the contract claim. The duty of good faith claims is subject to revision on remand. We see no abuse of discretion by the district court thus far.

### Full Faith and Credit/State Sovereignty

{98} Lastly, Kemper argues that any decision by New Mexico courts in a nationwide class action will unconstitutionally impinge on the rights of the other states to control insurance disclosure rules and "the meaning of insurance contracts" within their borders. Kemper relies on the fact that the insurance forms it issued were all approved by state regulators. Kemper also relies on the effect of the *McCarran–Ferguson Act,* 15 U.S.C. § 1012 (1947) in relegating to the states the power to regulate insurance practices to assert that a decision here will not be respectful of other states' sovereignty. We disagree.

{99} Kemper's argument is based on its position that the law of the several states is inherently different—and perhaps unknowable to another state's courts. We agree that nuance in a general area of the law can be very important and must be recognized and respected. Our lengthy discussion above concerning the predominance issue as it is impacted by potential differences in state law is evidence of that. But when the law is substantially uniform even when taking nuance into account, there can be no constitutional insult to a sister state simply because the law is enforced by New Mexico.

{100} We give more weight to the assertion that a decision here might unduly interfere with legislative and administrative regulation. If, for example, the district court or we had been cited foreign statutes or regula-

tions that prohibited disclosures of the kind the class seeks, we would be well-advised to consider carefully whether we could act to the contrary. However, we have not been cited any such statute or regulation. None of the regulations cited by Kemper prohibits the disclosures the class seeks. Kemper relies on testimony from one of its witnesses describing his conversations with various insurance commissioners about modal premium disclosure issues. These "brief" encounters reveal little about the commissioner's memories or personal opinion on the issue. They reveal nothing about any official state position. This testimony does not raise any constitutional or comity concerns.

{101} Further, Kemper does not refute the basic idea that regulatory approval is not binding on courts. Final authority with regard to matters of fairness, completeness, compliance with statutory requirements, and certainly breach of contract, rests with the courts. *See Montano v. Allstate Indem. Co.*, 2004–NMSC–020, 135 N.M. 681, 92 P.3d 1255 (2004); *Azar*, 2003–NMCA–062,¶ 69, 133 N.M. 669, 68 P.3d 909; *Sandoval v. Valdez*, 91 N.M. 705, 710, 580 P.2d 131, 136 (Ct.App.1978) (Sutin, J., specially concurring) (noting that insurance superintendent's authority to approve forms was not final). This is not to say that insurance regulators are simply to be ignored. Charged with regulatory responsibility and possessed of a level of expertise, their position can be valuable and should be taken into due account. But their view should not simply be accepted as the only answer. Courts have an independent responsibility to decide issues properly brought before them.

## CONCLUSION

{102} We affirm the district court's certification of the breach of contract class. We reverse the certification of the duty of good faith class and remand for further consideration in accordance with this opinion.

{103} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and CYNTHIA A. FRY, Judges.

# APPENDIX

**FEDERAL KEMPER LIFE ASSURANCE COMPANY**
A Stock Life Insurance Company
Long Grove, IL 60049

| | | | |
|---|---|---|---|
| Insured | CHARLES G BERRY | Age | 57 |
| Policy Date | JUN 03 1991 | Policy Number | FK1886870 |
| Face Amount | $600,000 | | |

**20 DAY RIGHT TO EXAMINE POLICY**
At any time within 20 days of receiving this policy you may return it to us or to the agent who sold it to you. Upon such delivery or mailing, this policy will be deemed void and all premiums paid will be returned.

We will pay the proceeds of this policy to the beneficiary when we receive due proof that the insured died while this policy was in force.

The insured is named in the Policy Specifications. If not later changed, the beneficiary is as named in the application.

We make these promises and issue this policy in consideration of the application for this policy and the payment of the premium due on the Policy Date.

The provisions that follow are part of this policy.

Signed for the Federal Kemper Life Assurance Company at its home office in Long Grove, Illinois.

Secretary          President

If this policy is in force:

Proceeds are payable at the insured's death prior to the Expiry Date; and

Premiums are payable during the lifetime of the insured until the Expiry Date.

Premiums are level for the first 10 policy years and increase each policy year thereafter as shown in the Policy Specifications.

After the first 10 policy years, premiums can be changed in accordance with the Change of Premium Section.

**TERM LIFE INSURANCE TO AGE 95 — CONVERTIBLE THROUGH 10TH POLICY YEAR, OR TO AGE 65 IF EARLIER**

**NON-PARTICIPATING — NO ANNUAL DIVIDENDS**

This policy is a legal contract between you and us.

**READ YOUR POLICY CAREFULLY.**

Plaintiff's
Exhibit 1

RP 15

482

S-3214

**INDEX**

| | Page No. |
|---|---|
| Age | Policy Specifications |
| Application | Attached to the Policy |
| Assignment | 6 |
| Beneficiary | Application, 7 |
| Change of Beneficiary | 7 |
| Change of Owner | 7 |
| Change of Plan | 6 |
| Change of Premium Section | 9 |
| Contestability | 6 |
| Contract | 8 |
| Conversion Section | 10 |
| Date of Issue | Policy Specifications |
| Definition of Terms Section | 5 |
| Evidence of Age, Death, Sex and Survival | 7 |
| Exchange Provision Section | 9 |
| Face Amount | Policy Specifications |
| General Section | 6 |
| Grace Period | 8 |
| Misstatement of Age and/or Sex | 6 |
| Non-Participating | 7 |
| Ownership Section | 7 |
| Premium Payment Section | 8 |
| Premiums (Amount Payable) | Policy Specifications |
| Proceeds Section | 8 |
| Reinstatement | 8 |
| Right To Examine Policy | Front Cover |
| Settlement Option Section | 11 |
| Suicide | 6 |

Additional Benefits listed in the Policy Specifications, if any, are described in the additional benefit agreements that follow page 12.

**Plaintiff's
Exhibit 1**

**RP 16**

POLICY SPECIFICATIONS

| INSURED | CHARLES G BERRY | 57 | AGE |
|---------|-----------------|-----|-----|
| POLICY DATE | JUN 03 1991 | 1886870 | POLICY NO. |
| FACE AMOUNT | $600,000 | | |

| POLICY BENEFITS | COVERAGE AMOUNT | EXPIRY DATE | FIRST YEAR ANNUAL PREMIUM |
|-----------------|-----------------|-------------|----------------------------|
| TERM LIFE INSURANCE TO AGE 95 | $  600,000 | JUN 03 2029 | $3,050.00 |

| TOTAL PREMIUMS | ANNUALLY | SEMI-ANNUALLY | QUARTERLY | MONTHLY PAC |
|----------------|----------|---------------|-----------|-------------|
| FIRST YEAR | $  3,050.00 | $  1,586.00 | $   915.00 | $   289.75 |

ANNUAL "CURRENT PREMIUMS AFTER THE FIRST POLICY YEAR" ARE SHOWN BEGINNING ON THE
NEXT PAGE.  ANNUAL "GUARANTEED MAXIMUM PREMIUMS AFTER THE FIRST POLICY YEAR" ARE
SHOWN ON THE PAGES THAT FOLLOW "CURRENT PREMIUMS AFTER THE FIRST POLICY YEAR".

AFTER THE FIRST 10 POLICY YEARS, PREMIUMS SHOWN WILL BE SUBJECT TO CHANGE IN
ACCORDANCE WITH THE CHANGE OF PREMIUM SECTION.  THE CURRENT ANNUAL PREMIUMS
AFTER ANY CHANGE CAN NEVER EXCEED THE GUARANTEED MAXIMUM ANNUAL PREMIUMS.

PREFERRED NONSMOKER RATE CLASS POLICY

DATE OF ISSUE:   JUL 29 1991

Plaintiff's
Exhibit 1

RP 17

484

POLICY SPECIFICATIONS
CURRENT PREMIUMS AFTER FIRST POLICY YEAR

PREMIUMS FOR POLICY BENEFITS

| POLICY YEAR | PREMIUM FOR TERM LIFE INSURANCE BENEFIT | TOTAL ANNUAL PREMIUMS |
|---|---|---|
| 2 | $ 3,050.00 | $ 3,050.00 |
| 3 | 3,050.00 | 3,050.00 |
| 4 | 3,050.00 | 3,050.00 |
| 5 | 3,050.00 | 3,050.00 |
| 6 | 3,050.00 | 3,050.00 |
| 7 | 3,050.00 | 3,050.00 |
| 8 | 3,050.00 | 3,050.00 |
| 9 | 3,050.00 | 3,050.00 |
| 10 | 3,050.00 | 3,050.00 |
| 11 | 13,958.00 | 13,958.00 |
| 12 | 15,380.00 | 15,380.00 |
| 13 | 16,922.00 | 16,922.00 |
| 14 | 18,674.00 | 18,674.00 |
| 15 | 20,972.00 | 20,972.00 |
| 16 | 22,934.00 | 22,934.00 |
| 17 | 25,556.00 | 25,556.00 |
| 18 | 28,502.00 | 28,502.00 |
| 19 | 31,670.00 | 31,670.00 |
| 20 | 35,000.00 | 35,000.00 |
| 21 | 38,570.00 | 38,570.00 |
| 22 | 42,248.00 | 42,248.00 |
| 23 | 46,148.00 | 46,148.00 |
| 24 | 51,482.00 | 51,482.00 |
| 25 | 57,500.00 | 57,500.00 |
| 26 | 64,376.00 | 64,376.00 |
| 27 | 72,218.00 | 72,218.00 |
| 28 | 80,948.00 | 80,948.00 |
| 29 | 90,410.00 | 90,410.00 |
| 30 | 100,490.00 | 100,490.00 |
| 31 | 111,128.00 | 111,128.00 |
| 32 | 122,144.00 | 122,144.00 |
| 33 | 133,682.00 | 133,682.00 |
| 34 | 145,874.00 | 145,874.00 |
| 35 | 158,906.00 | 158,906.00 |
| 36 | 173,156.00 | 173,156.00 |
| 37 | 189,164.00 | 189,164.00 |
| 38 | 209,240.00 | 209,240.00 |

AFTER THE FIRST 10 POLICY YEARS, PREMIUMS SHOWN MAY BE CHANGED IN ACCORDANCE WITH THE CHANGE OF PREMIUM SECTION.

Plaintiff's
Exhibit 1

RP 18

POLICY SPECIFICATION
GUARANTEED MAXIMUM PREMIUMS AFTER FIRST POLICY YEAR

PREMIUMS FOR POLICY BENEFITS

| POLICY YEAR | PREMIUM FOR TERM LIFE INSURANCE BENEFIT | TOTAL ANNUAL PREMIUMS |
|---|---|---|
| 2 | $ 3,050.00 | $ 3,050.00 |
| 3 | 3,050.00 | 3,050.00 |
| 4 | 3,050.00 | 3,050.00 |
| 5 | 3,050.00 | 3,050.00 |
| 6 | 3,050.00 | 3,050.00 |
| 7 | 3,050.00 | 3,050.00 |
| 8 | 3,050.00 | 3,050.00 |
| 9 | 3,050.00 | 3,050.00 |
| 10 | 3,050.00 | 3,050.00 |
| 11 | 31,346.00 | 31,346.00 |
| 12 | 34,544.00 | 34,544.00 |
| 13 | 38,012.00 | 38,012.00 |
| 14 | 41,954.00 | 41,954.00 |
| 15 | 47,126.00 | 47,126.00 |
| 16 | 51,542.00 | 51,542.00 |
| 17 | 57,440.00 | 57,440.00 |
| 18 | 64,070.00 | 64,070.00 |
| 19 | 71,198.00 | 71,198.00 |
| 20 | 78,686.00 | 78,686.00 |
| 21 | 86,720.00 | 86,720.00 |
| 22 | 94,994.00 | 94,994.00 |
| 23 | 103,772.00 | 103,772.00 |
| 24 | 115,772.00 | 115,772.00 |
| 25 | 129,314.00 | 129,314.00 |
| 26 | 144,782.00 | 144,782.00 |
| 27 | 162,428.00 | 162,428.00 |
| 28 | 182,072.00 | 182,072.00 |
| 29 | 203,360.00 | 203,360.00 |
| 30 | 226,040.00 | 226,040.00 |
| 31 | 249,974.00 | 249,974.00 |
| 32 | 274,760.00 | 274,760.00 |
| 33 | 300,722.00 | 300,722.00 |
| 34 | 328,154.00 | 328,154.00 |
| 35 | 357,476.00 | 357,476.00 |
| 36 | 389,540.00 | 389,540.00 |
| 37 | 425,558.00 | 425,558.00 |
| 38 | 470,726.00 | 470,726.00 |

Plaintiff's
Exhibit 1

RP 19

## DEFINITION OF TERMS SECTION

**Age at Issue:** The insured's age nearest birthday on the Policy Date. This is the Age shown in the Policy Specifications.

**Application:** The application for this policy attached to and made a part of this policy.

**Beneficiary:** The party(s) so named in the application, unless later changed as provided in this policy.

**Date of Issue:** The date shown in the Policy Specifications. The Suicide and Contestability provisions use this date.

**Due Proof:** Information or evidence submitted to us sufficient to satisfy us of the existence of a fact or condition.

**Insured:** The person whose life is insured under this policy as shown in the Policy Specifications.

**Policy Anniversary:** The same day and month as the Policy Date for each succeeding year this policy remains in force.

**Policy Date:** The effective date of coverage under this policy if all the terms of the application are satisfied, including the payment of the premium due. The date from which policy anniversaries, policy years, policy months and premium due dates are determined. This date is shown in the Policy Specifications.

**Policy Specifications:** The pages of this policy so titled which show your benefits, premium and other information.

**Policy Year:** A one year period of time starting on successive policy anniversaries, with the first policy year starting on the Policy Date.

**Rate Class:** The mortality or morbidity classifications assigned under this policy.

**Request:** A request in writing on a form acceptable to us, signed by you and received by us.

**Supplemental Application:** A request for reinstatement of or a change to this policy.

**We, Our, Ours, Us:** Federal Kemper Life Assurance Company, Long Grove, Illinois 60049.

**You, Your, Yours:** The party(s) named as owner in the application unless later changed as provided in this policy.

Plaintiff's
Exhibit 1

S-3214

## GENERAL SECTION

**Contract**

This policy, with any proper changes, is the entire contract between you and us. Only our president, vice-president, secretary, or assistant secretary can change, modify, or waive any provisions of this policy.

This policy includes: 1. the Policy Specifications; 2. the attached application; and 3. any supplemental applications, riders, amendments or endorsements made a part of this policy.

**Contestability**

We rely on the statements made in the application for this policy. We also rely on statements made in any supplemental application or request for a change of this policy. In the absence of fraud, they are deemed representations and not warranties. In addition to the other reasons permitted by law, we can contest the validity of: 1. this policy; 2. any reinstatement of this policy; or 3. any supplemental benefit or rider added, if.

a. any material misrepresentation of fact is made in the application, a supplemental application or a request; and

b. a copy of that application, supplemental application or request is attached to this policy when issued or is later made a part of this policy.

We will not contest the validity of this policy after it has been in force, during the insured's life, for 2 years from the Date of Issue. With respect to: 1. any reinstatement of this policy, or 2. any supplemental benefit or rider added, we will not contest the validity of the change or reinstatement after they have been in effect during the insured's life, for 2 years. However, we can always contest the validity of this policy for the non-payment of any premium due.

**Suicide**

We will limit the proceeds we pay under this policy if the insured commits suicide, while sane or insane:

1. within 2 years from the Date of Issue; and

2. after 2 years from the Date of Issue, but within 2 years from the effective date of the last reinstatement of this policy.

The limited amount will equal all premiums paid on this policy.

**Misstatement of Age and/or Sex**

If the age and/or sex of the insured was misstated to us, the benefits under this policy are those which the premiums paid would have bought for the insured's correct age and sex.

**Assignment**

You may assign this policy if you file the assignment or a certified copy with us. When filed, your rights and those of the beneficiary are subject to the assignment. No assignment is binding on us unless we receive it in writing. We are not responsible for the validity or sufficiency of any assignment. Any claim is subject to due proof of the interest of the assignee.

**Change of Plan**

You may change the plan or the amount of insurance or both as long as we both agree.

Plaintiff's
Exhibit 1

RP 21

488

## PREMIUM PAYMENT SECTION

**General**

Premium payments are payable to us at the home office or to an authorized representative. A receipt for premium payments signed by our secretary will be furnished if requested. The first premium is due on or before the date this policy is delivered to you. All premium checks must be made payable to us. A premium paid is deemed fully earned on its due date. Once earned, a premium is non-refundable except as may be specifically stated in this policy.

**Frequency**

Premiums are due in advance at the start of each billing period. At issue, the billing period you selected in the application will apply. The amount of premium due for a billing period is shown in the Policy Specifications. Subject to our minimums, the billing period may be annual, semi-annual, or quarterly. You can arrange by request: 1. to change the billing period; and 2. to have preauthorized monthly payments withdrawn from your bank account. After the first policy year, the semi-annual, quarterly, or preauthorized monthly payments for each policy year will be determined on the same basis as that used to determine the premium for the selected mode for the first policy year.

**Grace Period**

A grace period of 31 days will be allowed for payment of each premium after the first. This policy will continue in force during the grace period. If the insured dies during the grace period, the unpaid premium will be deducted from the proceeds.

**Reinstatement**

Reinstatement means to restore this policy to a normal in force status after it has gone into default because a premium due was not paid before the end of a grace period. We will reinstate this policy if we receive:

1. your request to do so: a. prior to the Expiry Date and the death of the insured, and b. within 3 years after the due date of the unpaid premium;

2. due proof that the insured is insurable at the original rate class;

3. payment of the premium from the date we agree to reinstate the policy to the next premium due date; and

4. the premium due for any coverage provided under the Grace Period.

A reinstatement will be effective only as of the date we approve your request for reinstatement.

## PROCEEDS SECTION

The proceeds are subject to adjustment under the Suicide and Misstatement of Age and/or Sex provisions. The amount of proceeds as defined below is subject to all provisions of this policy.

The proceeds payable on the death of the insured are equal to:

1. the face amount of this policy; plus

2. any supplemental benefits and riders payable on the life of the insured; less

3. any premium needed as set forth in the Grace Period provision; plus

4. any advanced premium deposits which are paid past the current payment period.

**Plaintiff's Exhibit 1**

RP 23

## CHANGE OF PREMIUM SECTION

Two sets of Total Annual Premiums for each policy year are shown in the Policy Specifications. One set is labeled "Current Premiums After First Policy Year." The other set is labeled "Guaranteed Maximum Premiums After First Policy Year." "Current Premiums After First Policy Year" and "Guaranteed Maximum Premiums After First Policy Year" are the same for the first 10 policy years. Premiums after the 10th policy year are subject to change. It is anticipated, though, that "Current Premiums After First Policy Year" will also be charged after the 10th policy year. We can never raise premiums above the respective "Guaranteed Maximum Premiums After First Policy Year."

If, after the 10th policy year, we change the "Current Premiums After First Policy Year," the change will be made for all insureds with the same issue age, sex, face amount, duration, and rate class as the insured. Changes in health or occupation will not affect any change in the premium rates. We will not change the premium for any riders or benefits other than the term life insurance benefit. We will send you: a. a notice of any change before it takes effect; and b. a new premium rate table when rates are changed which shows the then current premium rates for all policy years.

## EXCHANGE PROVISION SECTION

At the end of 10 years you may exchange this policy one time for a new policy of the same type. On the 10th policy anniversary we will exchange this policy for a new policy if: a. we receive satisfactory evidence of insurability; and b. we did not issue this policy in exchange for another policy of the same type. The 10th anniversary is the Exchange Date. All premiums due on this policy must have been paid before the Exchange Date. The face amount of the new policy must be equal to or less than the face amount of this policy. The new policy is subject to the following terms.

1. You must complete and submit a new application to us not more than 90 days or less than 60 days before the Exchange Date.

2. We must approve the issuance of the new policy before it can become effective.

3. You must pay the first premium on the new policy in order for the new policy to become effective.

4. Coverage under this policy terminates when coverage under the new policy begins.

5. The new policy will be on the same plan as this policy.

6. The policy date of the new policy will be the Exchange Date. The issue age on the new policy will be the insured's attained age nearest birthday on the Exchange Date. Annual premium rates for the new policy will be those applicable to such policies issued on the Exchange Date.

7. The insured's attained age, nearest birthday on the Exchange Date, can not exceed 75.

8. Any rider or benefit in this policy can be included in the new one. Any rider or benefit is subject to the rules and premium rates we are using on the policy date of the new policy.

9. We will pay for the required evidence of insurability.

Plaintiff's Exhibit 1

Page 9

RP 24

**490**

APPLICATION TO
**FEDERAL KEMPER LIFE ASSURANCE COMPANY**          RECEIVED
**FIDELITY LIFE ASSOCIATION**, A Mutual Legal Reserve Company
Long Grove, IL 60049                               May 2 4 1991
**LIFE APPLICATION - PART A - GENERAL INFORMATION**   Ass'd............
(MUST BE COMPLETED IN ALL CASES)

| 1. PROPOSED INSURED ☐ Male ☐ Female | Birthdate _12- 5- 33_ | Age Nearest Birthday _57_ |
|---|---|---|
| First Name  Middle Initial  Last Name | Birthplace (State or Country) | Soc. Sec. No. |
| _CHARLES_  _G._  _BERRY_ | _TEXAS_ | _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_ |

2. Residence Address
RFD or Street ___1408 SAN PABLO NE___
City _Albuquerque_ State _NM_ Zip _87110_
Phone No; Area Code _(505) 265-0849_

3. What is your occupation? _Attorney_
Describe duties _Usual duties for Trial_
_Lawyer_

4. Employer's Name and Address _Charles G. Berry & Assoc_
_2400 Louisiana NE AFC 5 #510_
_Albuquerque  NM  87110_
Phone No/ Area Code _(505) 883-2900_

5. Are you a citizen of the U.S.? ☑ Yes ☐ No
If not, state country and type of visa.___

6. Have you ever flown or do you intend to fly as a pilot or crew member in any flying activity? ☐ Yes ☑ No
(If yes, complete Aviation Supplement, Part C)

7. Do you skin or SCUBA dive, sky dive, hang glide, or race motor vehicles, motorcycles or boats? ☐ Yes ☑ No

8. Have you had your driver's license suspended or revoked in the past three years? ☐ Yes ☑ No
Driver's License State and No _NM  0504 3875_

9. List life insurance in force (if none, state none)

| Company | Amount | Year Issued | ADB? |
|---|---|---|---|
| _TRANSAM-Occid_ | _597,500_ | _1987_ | _-_ |
| _EXECUTIVE LIFE_ | _500,000_ | _1987_ | |
| _NEW YORK LIFE_ | _100,000_ | _?_ | |
| _(POLICY OWNED & RETAINED BY FORMER EMPLOYER as Key Man Coverage)_ | | | |

10. Is this policy to replace any existing insurance or annuities? ☑ Yes ☐ No
(If yes, complete any required Replacement Forms)

11. Are there life insurance applications pending with any other companies? ☑ Yes ☐ No

12. Have you ever been refused life insurance or been asked to pay an extra premium for life insurance? ☑ Yes ☐ No

13. Give details of any "YES" answers to questions 7, 8, 10, 11, 12:
_10: This Policy to Replace Trans-Occid_
_# 92143092._
_11: Application to Jackson National to_
_replace Executive Life : #1 4721867_

14. Plan of Insurance ___Kemper Super T-10___
☑ Initial Death Benefit $ _600,000_
or if Universal Life,
☐ Specified Amount of Insurance $ ___
  ☐ Opt. (A) To Include Cash Value, or
  ☐ Opt. (B) In Addition to Cash Value
Rate Class Applied For _PREFERRED NON-SMOKER_
PA Riders:
☐ WP/WMD                    ☐ ___
☐ AIR $ ___                 ☐ ___
☐ DCR* ___ Units            ☐ ___
☐ FDR* ___ Units            ☐ ___
*Complete. Part O, Multiple Life Supplement.
Is the automatic premium loan wanted if available?
☐ Yes ☐ No

15. This application is to (check one):
☑ Federal Kemper Life Assurance Company
☐ Fidelity Life Association

16. If application is to Fidelity Life Association, dividends are to be:
☐ Paid in cash
☐ Used to reduce premiums
☐ Used to buy additional paid up insurance
☐ Left to accumulate at interest
☐ ___

17. Bill Form: ☐ List Monthly   ☐ P.A.C. Monthly
Direct: ☐ Annual  ☑ Semi-annual  ☐ Quarterly
All billing notices are to be sent to (check one):
☑ Owner.
☐ Other (give address) ___

Planned Periodic Premium $ _1586.-_

18. Amount remitted with this application (in exchange for Conditional Receipt bearing the same number as this application): $ _NONE_

19. Applicant and Owner (check one):
☑ Proposed Insured
☐ Other than Proposed Insured
  Name ___
  Address ___
  Relationship to Insured ___
  Taxpayer I.D. or S.S. No. ___

20. Special requests: ___

**Plaintiff's Exhibit 1**

**RP 28**